Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FAITH CENTER CHURCH
EVANGELISTIC MINISTRIES, a
California non-profit religious
corporation; HATTIE HOPKINS, an
individual,
           *Plaintiffs-Appellees,*

                    v.

FEDERAL D. GLOVER, member and
Chair of the Contra Costa County
Board of Supervisors; MARK
DESAULNIER; JOHN M. GIOIA;
MILLIE GREENBERG, members of the
Contra Costa County Board of
Supervisors; JOHN W. SWEETEN;
ANNE CAIN, Contra Costa County
Librarian; PATTY CHAN, Senior
Branch Librarian for the Antioch
Branch of the Contra Costa
County Public Library; LAURA
O'DONAHUE, Administrative
Deputy Director for the Antioch
Branch of the Contra Costa
County Public Library; GAYLE B.
UILKEMA,
           *Defendants-Appellants.*

No. 05-16132

D.C. No.
CV-04-03111-JSW

ORDER
AMENDING
OPINION AND
DISSENT TO
ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

2731

Argued and Submitted
February 17, 2006—San Francisco, California

Filed September 20, 2006
Amended March 9, 2007

Before: Richard A. Paez and Richard C. Tallman,
Circuit Judges, and Lawrence K. Karlton,*
Senior District Judge.

Order;
Dissent to Order by Judge Bybee;
Opinion by Judge Paez;
Concurrence by Judge Karlton;
Dissent by Judge Tallman

---

*The Honorable Lawrence K. Karlton, Senior United States District Judge for the Eastern District of California, sitting by designation.

## COUNSEL

Silvano B. Marchesi, Kelly M. Flanagan, and Danielle R. Merida, County Counsel, Martinez, California; Debra S. Belaga and Colleen M. Kennedy, O'Melveny & Myers LLP, San Francisco, California, for the appellants.

Benjamin W. Bull, Gary S. McCaleb, and Jordan W. Lorence, Alliance Defense Fund, Scottsdale, Arizona; Elizabeth A. Murray, Alliance Defense Fund, Washington, D.C.; Timothy D. Chandler, Alliance Defense Fund, Folsom, California; Terry L. Thompson, Law Offices of Terry L. Thompson, Alamo, California, for the appellees.

## ORDER

The final sentence of the seventh paragraph of Section V.A. of the Opinion filed September 20, 2006 and published at 462 F.3d 1194, 1209 (9th Cir. 2006), is amended by inserting the following after "*See id*. at 138 n. 3, 121 S.Ct. 2093": "(Souter, J., dissenting)."

The full court was advised of the petition for rehearing en banc. A judge of the court called for a vote on whether to rehear the matter en banc. On such vote, a majority of the nonrecused active judges failed to vote in favor of en banc rehearing.

The petition for rehearing en banc is DENIED. Judge Bybee's dissent from denial of en banc rehearing is filed concurrently herewith.

---

BYBEE, Circuit Judge, with whom O'SCANNLAIN, KLEINFELD, TALLMAN, CALLAHAN, BEA and SMITH, JR., Circuit Judges, join, dissenting from the denial of rehearing en banc:

The panel majority's decision permits the government to single out what it calls "mere religious worship" for exclusion from a forum that it has opened broadly for use by community and cultural groups. In so doing, the majority has disregarded equal-access cases stretching back nearly three decades, turned a blind eye to blatant viewpoint discrimination, and endorsed disparate treatment of different religious groups. I respectfully dissent from the court's decision not to rehear this case en banc.

I

The Contra Costa County Library makes its rooms generally available to the public for "educational, cultural and community related meetings, programs and activities." *Faith Ctr. Church Evangelistic Ministries v. Glover*, 462 F.3d 1194, 1198 (9th Cir. 2006). The County's policy contains several time, place, and manner restrictions, along with one purportedly content-based restriction: The rooms "shall not be used for religious services." *Id.* at 1198-99. All other meetings—including those involving religious speech short of "services"—are welcome to the library.[1]

---

[1] The library's policy has undergone some refinement. Prior to 2004, the policy said no "religious purposes." In mid-2004, the policy was amended to prohibit "religious services or activities." In late 2004, the Board of Supervisors adopted the current no "religious services" policy. The panel majority's opinion appears to revise it yet again, narrowing the prohibition to encompass only religious services that consist of "mere religious worship."

Faith Center Evangelistic Ministries Outreach reserved a meeting room at the County's Antioch Library for a four-hour period. In its promotional flyers, Faith Center described the scheduled meeting as having two components: two hours in the morning for a "Wordshop" entitled " 'The Making of an Intercessor,' an End-Time call to Prayer for every Believer, and how to pray fervent, effectual Prayers that God hears and answers," and two hours in the afternoon for a "Praise and Worship" meeting, including a sermon. The library ultimately advised Faith Center that it could conduct its "Wordshop" but not its "Praise and Worship" session. The district court enjoined the County's policy because it was likely to result in impermissible viewpoint discrimination. *Faith Ctr. Church Evangelistic Ministries v. Glover*, 2005 WL 1220947, at *1 n.1 (N.D. Cal. 2005).

A divided panel disagreed. The majority declared that "[p]ure religious worship . . . is not a secular activity that conveys a religious viewpoint on [an] otherwise permissible subject matter." *Faith Ctr.*, 462 F.3d at 1210. Thus, religious worship "is not a viewpoint but a category of discussion," and a "blanket exclusion of religious worship services from the forum is [a permissible one] based on the content of speech."[2]

---

[2]Judge Karlton wrote separately to criticize the Supreme Court's decisions in *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001), and *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), for the "majorities' disdain of the Jefferson model" and "belief that religious values enhance rather than endanger society." *Faith Ctr.*, 462 F.3d at 1215 (Karlton, J., concurring). He then observed:

> It may be that the majority of the Supreme Court really has doubt about the ability to distinguish between religious practice and secular speech. If so, they need only leave their chambers, go out in the street and ask the first person they meet whether in the instant case the conduct is religious in character. It is simply untenable to insist that there is no difference between a prayer and e.g. political speech. To coin a phrase, one can only pray for the court's enlightenment.

*Id.* at 1216.

*Id.* at 1211. Judge Tallman dissented, accurately describing the County as having "draw[n] an arbitrary line in the sand." *Id.* at 1217 (Tallman, J., dissenting).

## II

Beginning with *Widmar v. Vincent*, 454 U.S. 263, 267 (1981), the Supreme Court has consistently held that once the government establishes a forum open generally to use by the public, it "assume[s] an obligation to justify its discriminations and exclusions under applicable constitutional norms." Under these norms, the government must grant both religious and non-religious groups access to the forum on equal terms. In other words, the government can exclude religious speech only if the content of that speech is not germane to the purposes of the forum or if the expressive activity violates standard time, place, and manner restrictions on the forum's use. *See Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 830 (1995). But the government cannot exclude religious speech simply because of its religious character.

The panel majority, however, authorized the County to do just that. It upheld the County's policy prohibiting the use of its library meeting rooms for "religious services" even though those rooms were otherwise generally open for "educational, cultural and community related meetings, programs and activities." "Religious services" undeniably fall within the broadly stated purpose of the forum, and Faith Center's worship services indisputably complied with all of the time, place and manner regulations governing use of the meeting room. In other words, the County's sole basis for excluding Faith Center from the library was the religious character of its speech activities.

By permitting the County to "justify its discrimination[ ] and exclusion[ ]" on the religious nature of the speech, *see Widmar*, 454 U.S. at 267, the majority has effectively rele-

gated religious worship to an inferior status vis-à-vis community and cultural speech that claims a secular component. This disparate treatment effectively nullifies the Supreme Court's statement in *Widmar* that "religious worship and discussion . . . are forms of speech and association protected by the First Amendment," *id.* at 269, and runs counter to the equal access cases that follow *Widmar. See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001); *Rosenberger*, 515 U.S. 819; *Lamb's Chapel v. Ctr. Moriches Sch. Dist.*, 508 U.S. 394 (1993).

A

In *Widmar*, the University of Missouri-Kansas City had enacted a policy governing access to university facilities that was uncannily similar to the policy here: It barred the use of university buildings, which were generally open to use by student groups, "for purposes of religious worship or religious teaching." *Widmar*, 454 U.S. at 265 n.3. Pursuant to this policy, the university denied an evangelical student group permission to use university facilities, in part because some of its activities consisted of religious worship.[3] *Id.* at 265. The Court held that this type of discrimination against groups seeking to engage in "religious worship and discussion" was improper because "[t]hese are forms of speech and association protected by the First Amendment." *Id.* at 269.

Given the close parallels between the policy and expressive activity involved in this case and those at issue in *Widmar*, the panel should have summarily affirmed the district court. The classrooms in *Widmar* were open broadly to the university

---

[3]The group's meetings generally consisted of the typical components of an evangelical worship service: "prayer, hymns, Bible commentary, and discussion of religious views and experiences." *Widmar*, 454 U.S. at 265 n.2. In his dissent, Justice White argued, and the majority appears to have accepted, that the student group's meeting was properly described as religious worship. *Compare id.* at 269-70 *with id.* at 283 (White, J., dissenting).

community just as the library's rooms here were open broadly to community and cultural groups. Like the student group in *Widmar*, the church here sought access for both worship and non-worship speech activities. As in *Widmar*, there was no constitutional basis for distinguishing between these forms of speech.

As the Court has explained in subsequent decisions, *Widmar*'s equal access rule imposes two requirements. First, once the government has opened a limited forum, it "must respect the lawful boundaries it has itself set" and "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum." *Rosenberger*, 515 U.S. at 829 (internal quotations omitted). Second, even if the exclusion reasonably relates to the purpose of the forum, any restriction must be viewpoint neutral. *Lamb's Chapel*, 508 U.S. at 397-98. The religious character of the speech is simply irrelevant to both of these requirements.

Thus, in *Lamb's Chapel*, where a school district had opened its property for "social, civic, and recreational uses" but prohibited groups from using its property for "religious purposes," 508 U.S. at 387, the Court held that the district had applied its policy unconstitutionally when it refused to grant access to the forum to a group wishing to show a film dealing with family issues and child rearing from a religious perspective, *id*. at 393-94. The film "dealt with a subject otherwise permissible under [the school district's policy], and its exhibition was denied solely because the series dealt with the subject from a religious standpoint." *Id*. at 394. Denial of access based on the religious nature of the speech constituted impermissible viewpoint discrimination.[4]

---

[4]Although the Court did not reach the issue, it subsequently implied that it would also have found the school district's exclusion unreasonable given the purposes of the forum. As the Court noted, the only reason the group sponsoring the film had not qualified as "a social or civic organization" under the school district's rules was because of its "religious purposes," which, of course, it had held to be constitutionally irrelevant. *Rosenberger*, 515 U.S. at 832.

Similarly, in *Rosenberger*, the Court held that the University of Virginia's policy of denying funds to student newspapers with "religious editorial viewpoints" violated the First Amendment because the university had excluded a particular perspective on "subjects . . . otherwise within the approved category of publications." 515 U.S. at 831. It was irrelevant both that some of the "viewpoints" were uniquely religious and lacked a secular counterpart and that the university's restriction, which barred all uniquely religious content, excluded "an entire class of viewpoints." *Id*. As the Court noted, "exclusion of several views . . . is just as offensive to the First Amendment as the exclusion of only one." *Id*.

In *Good News Club*, the Court confirmed that even "quintessentially religious" speech, including worship and evangelization, cannot be excluded from a forum so long as that speech is reasonably related to the purposes of the forum. 533 U.S. at 111. In that case, the school had set aside the forum for use by "any group that promote[s] the moral and character development of children." *Id*. at 108 (internal quotations omitted) (alteration in original). Although the speech at issue had components that could be described only as "religious worship," the Court concluded that it "address[ed] a subject otherwise permitted under the rule . . . from a religious standpoint." *Id*. at 109. Because there was no difference between the Club's invocation of Christianity and "the invocation of teamwork, loyalty, or patriotism by other associations" in addressing a matter germane to the purpose of the forum, the school could not rely on the religious nature of the former in excluding the Club. *Id*. at 111-12.

Faith Center's speech here fits squarely within the protections erected by these cases. As noted above, religious services—both as religious expression per se, *see, e.g.*, J.S. Bach, *Mass in B Minor*, and as vehicles for moral and theological teaching—bear a reasonable relationship to the "educational, cultural and community" purposes for which the County has set aside its library meeting rooms. Given this

relationship, the County's express exclusion of religious speech—and only religious speech—is a pure viewpoint-based exception and is plainly prohibited by the First Amendment.

B

The majority attempts to avoid the great weight of these cases by arguing that "mere religious worship" is not a viewpoint but a separate category of discussion distinguishable from other religious speech. The majority argues that, unlike the religious speech at issue in the Supreme Court's equal access jurisprudence, "mere religious worship" has no secular counterpart on which it provides a religious perspective; in other words, under the majority's view, whether religious speech offers a viewpoint is judged entirely by a secular standard, and the absence of a secular counterpart means that "mere worship" can be treated as a separate, and perhaps unique, category of speech. *See Faith Ctr.*, 462 F.3d at 1210-11. The majority further argues that the Court itself recognized "mere religious worship" as a separate—and constitutionally inferior—category of speech in *Good News Club*. *See id*. at 1209. None of these objections survives close scrutiny.

First, *Widmar* rejects outright any attempt to make "a distinction between the kinds of religious speech explicitly protected by [its] cases and a new class of religious speech act[s] constituting worship." *Widmar*, 454 U.S. at 269 n.6 (citation and internal quotations omitted) (second alteration in original); *see also id*. at 284-86 (White, J., dissenting). The Court noted "at least" three difficulties with the proposed distinction: (1) it lacks intelligible content; (2) it is not "within the judicial competence to administer"; and (3) it is a constitutionally irrelevant basis for distinguishing among different types of religious speech. *Id*. at 269 n.6. Even if *Widmar*'s express rejection of the panel majority's distinction were not dispositive, it would still collapse under the weight of these three objections.

Second, *Rosenberger* undermines the viability of the content/viewpoint distinction in this context. The Court noted in that case that "discrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination." *Rosenberger*, 515 U.S. at 830-31 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). Although religion can be classified both as a subject area and as a viewpoint, the Court explained that exclusion of religious speech constitutes impermissible viewpoint discrimination because it involves "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id*. at 831. Notably, the Court treated speech activity that lacked a secular corollary, such as proselytization, no differently from that which offered a religious viewpoint on an otherwise secular topic.

Within the *Rosenberger* framework, the panel majority simply has no basis for drawing the line at worship in this context. The library has opened its rooms for cultural and community activities, an exceptionally broad category of speech that includes religious speech. The County acknowledges that religion as such is an "otherwise permissible category" that falls within the scope of the forum's stated purposes, but it expressly bars a particular subset of constitutionally protected speech—worship—that addresses religious, not to mention community, social, moral, and educational, matters from a particular viewpoint.[5]

---

[5]The content/viewpoint distinction may have some explanatory power, but in only in very narrow circumstances, such as in public schools or other fora opened for very limited purposes. For example, even though a public school could not permit Good News Club to make announcements over the public address system while forbidding the Hillel Society from doing so, it could forbid them both from using the PA system to conduct devotionals. The time for announcements is dedicated time, and the school may restrict the content of the announcements to germane when-and-where information. Similar content-based restrictions could be imposed if the forum has been established for a very narrow purpose, such as the moral education of children, as in *Good News Club*.

There are, of course, perfectly permissible means by which categories of speech—including worship activities—could be excluded from the library. For example, if the library had set aside its meeting rooms for book clubs, it could certainly exclude every other category of expressive activity that did not fall within the purposes of the forum. The library could exclude worship services that were not book clubs, just as it could exclude political debates and city council meetings. What it could not do is exclude book clubs discussing the Koran, the Torah, or the Tibetan Book of the Dead. Or the library might open its meeting rooms broadly, while prohibiting food or drink. That policy would exclude meetings at which communion might be served, or a Seder celebrated, or prashad distributed, just as it would exclude serving refreshments at a Boy Scout Court of Honor or tea at a meeting of the Garden Club. What the library cannot do is permit food and drink *except* when it is consumed in connection with religious services. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). But that is exactly what the library has done here: It has opened the forum to all community and cultural speech *except* such speech that encompasses a viewpoint that is unique to religion.

Third, contrary to the panel majority's view, *Good News Club* does not support the separation of "mere worship" from other religious speech. In making this distinction, the majority relies heavily on footnote four of the Court's opinion in *Good News Club*, which it reads as distinguishing between the Club's activities and "mere religious worship." *See Faith Ctr.*, 462 F.3d at 1209. However, any distinction drawn by the Court makes sense only in the context of the narrowly defined forum in that case.

These considerations are not relevant here. Contra Costa has opened the library to the broadest of audiences "for meetings, programs, or activities of educational, cultural or community interest." It is hard to conclude that Faith Center's activities—worship or otherwise—don't fall well within those expansive guidelines.

In *Good News Club*, New York had adopted regulations under which school boards could open the schools to public use. 533 U.S. at 102. One of the authorized purposes was for "teaching morals and character development to children." *Id.* at 108. Nevertheless, the school rejected a request by the Good News Club to use the school's facilities for that purpose. *Id.* at 103-04. The Court found that it was "clear that the Club teaches morals and character development to children," and held that it was irrelevant that the Club offered a religious perspective on that subject. *Id.* at 108, 110-12. The Court held that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Id.* at 112.

In a footnote responding to Justice Souter's dissent, the Court "conclude[d] that the Club's activities [did] not constitute mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n.4. The Court was pointing out only that the Club's activities were reasonably related to the purposes of the limited forum; in that sense, the Club's activities were not "mere religious worship" lacking any connection to the purpose of the forum. If the Club had attempted to conduct worship that contained no references to moral and character development in children, the school could have denied permission for such use, just as it could have denied permission for a "mere political discussion" or a "mere Tupperware party" also devoid of such content. The relevant distinction was between "mere religious worship" and worship that bore a relationship to the narrow purposes of the dedicated forum, not between a category of fully protected religious speech with a secular component or counterpart and speech that is less protected because it is exclusively religious. Here, the County has opened its library meeting rooms *generally* to community groups for a wide range of cultural and community activities; the distinction between "mere religious worship" and other forms of religious speech is thus utterly irrelevant. Whatever "mere religious worship" involves, it is

both a cultural and a community activity and as such certainly constitutes an "otherwise permissible subject[ ]" under the County's policy. *See Good News Club*, 533 U.S. at 112.

## III

The likely effect of the majority's rule in the real world confirms that it ratifies viewpoint-based discrimination and raises profound Establishment Clause concerns. The Court has "consistently and firmly deprecated" government policies favoring one religion over another, *Larson v. Valente*, 456 U.S. 228, 246 (1982), and subjects to strict scrutiny policies that "facially differentiate[ ] among religions," *Hernandez v. Commissioner*, 490 U.S. 680, 695 (1989). The rule established by the majority violates these principles by privileging some religious groups over others.

That the County's policy treats religious groups differently is clear from even a brief survey of American religious denominations. For example, under the majority's test, Evangelicals and Unitarian groups should generally be granted access: Moral teaching is integral to their services, as are fellowship, singing, and other distinctly non-worship activities. Liturgically oriented denominations such as Episcopalians and Catholics will find themselves subject to greater burdens: The worship elements of their services are more distinct and easily severable from the non-worship elements, and they have more services (such as the Daily Office in the Catholic tradition) that can be characterized in their entirety as "mere worship."

Furthermore, under the majority's approach, a diverse range of religions may use the County's library meeting rooms for "religious services" without fear of County censorship because their services cannot be characterized as "mere worship." The last half-century has seen a flowering in this country of non-theistic religions that either do not recognize or do not worship any divine being. Rather, these religions—

including certain strands of Buddhism, Confucianism, and newer groups such as the American Ethical Union (or Ethical Humanism)—concern themselves primarily, or even exclusively, with ethical principles.

Although each of these groups conducts "religious services" that may be highly ritualistic, none of them—by definition—engages in anything that could plausibly be called "mere worship." Thus, whether the County was confronted with a Buddhist group desiring to conduct a religious service —before a statue of the Buddha and surrounded by candles and incense—consisting of meditation on the Eightfold Path or an Ethical Humanist group scheduling a service devoted to "consecrating [participants'] lives to acting in ways that honor [their] primary commitment to respect the worth and dignity of each person and to create human institutions which enable societies . . . to do so as well," Jone Johnson Lewis, *Ethical Culture as Religion*, http://www.aeu.org/religion.html (last visited Feb. 22, 2006), it would have to grant the application under the majority's rule permitting the exclusion only of "mere worship." After all, neither group would identify its activities as worship, nor, indeed, does either engage in anything akin to traditional, Judeo-Christian "worship." Yet to the average outside observer, both services would likely appear indistinguishable from the activities the majority calls "mere worship," and indeed, both groups would view their activities as quintessential religious activity. That one group would be granted access to engage in such activity and another denied is patently unconstitutional. As the Supreme Court recognized over four decades ago, disparate treatment of theistic and non-theistic religions is as offensive to the Establishment Clause as disparate treatment of theistic religions. *See Torcaso v. Watkins*, 367 U.S. 488, 495 (1961); *see also Lee v. Weisman*, 505 U.S. 577, 617 (1992) (Souter, J., concurring) (noting that a policy that treats theistic religions similarly is not sufficiently universal to avoid Establishment Clause concerns because many religions are non-theistic).

IV

The majority's rule permits government entities to deny access to a limited public forum made generally available to community groups solely on the basis of the uniquely religious viewpoint of the speaker. In doing so, the majority has jettisoned three decades of equal access jurisprudence, created a constitutionally inferior category of religious speech, and given governments throughout our circuit license to favor certain religions over others. I respectfully dissent from the order denying rehearing en banc.

**OPINION**

PAEZ, Circuit Judge:

This appeal from the grant of a preliminary injunction involves an evangelical Christian church seeking access to a public library meeting room to conduct, among other activities, religious worship services. We are called upon to navigate between two equally important interests: the church's right to access a government building that is open to other groups, and the government's right to preserve its property for its intended uses. We conclude that the district court erred when it found that the church was likely to succeed on the merits of its First Amendment claim and therefore abused its discretion in granting preliminary injunctive relief. We have jurisdiction under 28 U.S.C. § 1292, and we reverse in part and remand.

**I.**

The relevant facts are not disputed. Contra Costa County ("County") makes available to the public its public library meeting rooms during operating hours. The County's goal in making these meeting rooms available is "to encourage the

use of library meeting rooms for educational, cultural and community related meetings, programs and activities." Pursuant to the County's library meeting room policy, "[n]on-profit and civic organizations, for-profit organizations, schools and governmental organizations" may use the meeting room space for "meetings, programs, or activities of educational, cultural or community interest." The County regulates use of the meeting rooms in the following ways: (1) library meeting rooms are available on a first-come, first-served basis; (2) the applicant must submit an application that identifies the applicant and purpose of the meeting; (3) access to the meeting room is contingent upon approval by the library staff, and the County library reserves the right to deny an application or revoke permission previously granted; (4) an applicant must pay a fee for use of the meeting room when a meeting is not open to the general public, when it charges an admission fee, or when it involves sales or solicitations; (5) schools may not utilize a meeting room "for instructional purposes as a regular part of the curriculum"; and (6) the library meeting room "shall not be used for religious services."

It is the last policy restriction on "Religious Use" that is the subject of this case. The "Religious Use" restriction has twice been amended since the present action was filed in the district court. Initially, the policy provided that "[l]ibrary meeting rooms shall not be used for religious purposes." In August 2004, the County modified the policy to prohibit use of library meeting rooms "for religious services or activities." On December 14, 2004, the County Board of Supervisors adopted Resolution No. 2004/655, the County's current policy, to prohibit "religious services" from being conducted in library meeting rooms.

Plaintiff Faith Center Church Evangelistic Ministries is a non-profit religious corporation led by plaintiff Pastor Hattie Mae Hopkins (collectively "Faith Center"). According to Faith Center's verified amended complaint, Pastor Hopkins believes that she is called to share her Christian faith with oth-

ers. Pastor Hopkins believes that there are many individuals who need to hear about the gospel of Jesus Christ but who may never enter a traditional church building. To reach those individuals, Pastor Hopkins holds meetings and worship services in non-church buildings under the auspices of Faith Center. Participants at Faith Center's meetings generally "(a) discuss educational, cultural, and community issues from a religious perspective; (b) engage in religious speech and religious worship; and (c) engage in discussing the Bible and other religious books [as well as] teaching, praying, singing, sharing testimonies, sharing meals, and discussing social and political issues."

Pastor Hopkins believes that divine providence guided her to begin holding Faith Center meetings in Antioch, California. In May 2004, Pastor Hopkins submitted applications requesting to use the County's Antioch Branch Library meeting room for May 29, 2004 and July 31, 2004. In each application, Pastor Hopkins described the purpose of Faith Center's meetings as "Prayer, Praise and Worship Open to the Public, Purpose to Teach and Encourage Salvation thru Jesus Christ and Build up Community." Pastor Hopkins received confirmation from Antioch Library staff that her applications had been approved and that Faith Center's dates were reserved on the library's calendar.

Faith Center advertised its May 29, 2004 meeting with a flyer describing a "Women of Excellence Conference" sponsored by Faith Center Evangelistic Ministries Outreach. The flyer stated:

> Coming to Antioch, California, on May 29th 2004, where the power of God would be moving to bring miracles into your life. "For this is the hour of the believer," thus saith the Lord, for divine impartation of spiritual gifts, and empowerment, for the body of Christ to move forward in total victory. Come and receive your blessing!

The flyer divided the day's activities into a "Wordshop" from 11:00 a.m. to 12:00 p.m., refreshments, and an afternoon "Praise and Worship" service with a sermon by Pastor Hopkins from 1:00 p.m. to 3:00 p.m. The topic of the morning "wordshop" was " 'The Making of an Intercessor,' an End-time call to Prayer for every Believer, and how to pray fervent, effectual Prayers that God hears and answers."

Faith Center held its meeting and service on May 29, 2004. Toward the end of the afternoon service, Antioch Library staff informed Faith Center representatives that they were not permitted to use the meeting room for religious activities. According to Faith Center, the library staff did not express concern about excessive noise but rather about a violation of the "Religious Use" policy, which, at that time, prohibited the use of library meeting rooms for "religious purposes."[1] In June 2004, the County removed Faith Center's July 31, 2004 meeting from the Antioch Library calendar and later confirmed with Faith Center that the July meeting had been cancelled.

On July 30, 2004, Faith Center sued to enjoin the County from excluding Faith Center's proposed religious meetings on the basis of the County's "Religious Use" policy.[2] Faith Center also sought a declaration that the meeting room policy was unconstitutional on its face and as applied to Faith Center's

---

[1]Faith Center contends that out of consideration for library patrons, the meeting participants did not use musical instruments or amplified sound. The County explains that the Antioch Library meeting room is not sound-proof and the May 29 service could be heard outside the meeting room. The County does not argue that excessive noise was a problem.

[2]Faith Center named as defendants Federal D. Glover (chair of the County Board of Supervisors); Mark DeSaulnier, John M. Gioia, Millie Greenberg, and Gayle B. Uilkema (members of the County Board of Supervisors); John Sweeten (County Administrator); Anne Cain (County Librarian); Patty Chan (Senior Librarian of the Antioch Branch); and Laura O'Donahue (Administrative Deputy Director of the Antioch Branch) (collectively the "County").

proposed use of the meeting room.[3] Faith Center expressed a desire to hold Saturday morning meetings in the Antioch meeting room every other month.

Before the district court, Faith Center argued that the County discriminated against Faith Center on the basis of the church's viewpoint when it enforced its old policy prohibiting access to the meeting room for "religious purposes" and cancelled Faith Center's July 31, 2004 meeting. Faith Center also asserted that enforcement of any of the County's "Religious Use" policies, including the current one barring "religious services," would result in viewpoint discrimination in violation of the First Amendment.

The County agreed that its former meeting room policies were overly broad and that Faith Center's morning "word-shop" at the May 29th meeting was the type of religious speech activity that would be permitted under the current policy. The County, however, argued that barring Faith Center's religious worship services from the meeting room was a permissible exclusion of a category of speech meant to preserve a limited public forum for its intended uses. The County viewed Faith Center's May 29th afternoon "praise and worship" session as mere religious worship exceeding the purpose for which the meeting room forum had been created.[4]

The district court granted Faith Center's motion for a pre-

---

[3]Faith Center also alleged that enforcement of the Library policy was hostile to religion in violation of the Establishment Clause; that the Library policy was facially invalid because the County had created a designated public forum and the policy's regulation of speech was not justified by a compelling governmental interest; and that the County violated Faith Center's right to equal protection. The district court did not address these separate claims.

[4]Although the County applied the "religious purposes" policy in existence at the time it cancelled the July 31st meeting, the County has consistently maintained that it would bar religious worship services from the library meeting room under the revised policy.

liminary injunction. *See Faith Center Church Evangelistic Ministries v. Glover*, No. 04-03111, 2005 WL 1220947 (N.D. Cal. May 23, 2005). The district court concluded that Faith Center was substantially likely to prevail on its claim that enforcement of the County's past or current library meeting room policies to exclude Faith Center's proposed religious worship activities would result in unconstitutional viewpoint discrimination. The district court granted relief on the basis of Faith Center's as applied challenge.

The district court based its order on four legal premises: (1) religious worship is speech protected by the First Amendment; (2) religious worship cannot be distinguished from other forms of religious speech; (3) the exclusion of religious worship from otherwise permissible speech of a religious nature constitutes viewpoint discrimination; (4) there was no compelling Establishment Clause concern to justify Faith Center's exclusion.[5]

As the district court made clear, it proceeded on the basis that the afternoon "praise and worship" session constituted pure religious worship services.[6] Faith Center did not dispute

---

[5]In light of the district court's determination that the County discriminated against Faith Center's speech on the basis of viewpoint, the court did not address the nature of the forum created by the County's policy of opening its library meeting rooms to the public.

[6]The transcripts of the preliminary injunction hearing show that the district court understood that the afternoon session constituted pure religious worship services, even as Faith Center's other activities earlier in the day did not:

> [Counsel for the County]: I have to take issue a little bit with the characterization that it is defendants who have characterized what Faith Center is doing as worship. Faith Center has characterized it that way, your honor.

> The Court: I know. They are making the argument even assuming it's worship. That gets into a set of new questions.

\*\*\*

this contention because it argued that even if the afternoon session was mere religious worship, the court could not draw a constitutionally permissible distinction between afternoon worship and the rest of Faith Center's religious speech activities. Thus, as the parties do, we understand the district court's grant of preliminary injunctive relief to enjoin application of the County's policy to bar religious worship services. This appeal followed.

## II.

We have jurisdiction under 28 U.S.C. § 1292. We will reverse the grant of a preliminary injunction when the district court has abused its discretion or has based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). Application of erroneous legal principles by the district court is an abuse of discretion. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Underlying issues of law are reviewed *de novo*, including the claim that the district court relied on an erroneous legal premise to arrive at its decision to grant a preliminary injunction. *See id.* Thus, we must determine "whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the

---

The Court: What is your bottom line? Is your bottom line then the Court cannot issue any injunction which has the effect of precluding, as you would call it or the courts call it, mere worship in the library rooms?

[Counsel for Faith Center]: That's right, your honor.

The dissent dismisses Faith Center's representation at the preliminary injunction hearing. *See* Dissent Op., at 2786 n.2. However, the representation is consistent with other evidence in the record that Faith Center intended its afternoon session to consist of religious worship services. *See supra* at 2750-51.

case." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (internal quotation marks and citation omitted).

## III.

A preliminary injunction may issue when the moving party demonstrates either "(1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *A&M Records, Inc.*, 239 F.3d at 1013. "These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases." *Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410, (9th Cir. 1991) (internal quotation marks and citation omitted). Accordingly, "if the movant has a 100% probability of success on the merits, this alone entitles it to reversal of a district court's denial of a preliminary injunction, without regard to the balance of the hardships." *Sammartano*, 303 F.3d at 965 (internal quotation marks omitted).

Because the district court concluded that enforcement of the County's library meeting room policy was substantially likely to violate Faith Center's right to freedom of expression, the court also concluded that Faith Center had demonstrated the requisite irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Sammartano*, 303 F.3d at 973 ("[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." (internal quotation marks and citation omitted)). We agree that the existence of a colorable First Amendment claim in this case is sufficient to demonstrate irreparable injury. We therefore confine our review to

determining whether Faith Center has demonstrated a likelihood of success on the merits of its First Amendment "as applied" challenge.[7]

## IV.

### A.

As a preliminary matter, our inquiry ends if Faith Center's religious services do not constitute "speech" subject to First Amendment protection. We conclude that Faith Center engaged in protected speech when its participants met in the Antioch Library for prayer, praise, and worship. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981) ("[R]eligious worship and discussion . . . are forms of speech and association protected by the First Amendment."); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111 (2001) (finding that activities "quintessentially religious" in nature such as religious instruction, prayer, and discussion and recitation of the Bible, are protected speech); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393-94 (1993) (finding that the presentation of cultural and educational subject matter from a religious perspective is speech protected by the First Amendment).

[1] The Constitution, however, does not guarantee that all forms of protected speech may be heard on government property. "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). The

---

[7]Because we conclude that the district court erred in granting relief on the basis of Faith Center's First Amendment as applied challenge, we need not address Faith Center's other constitutional arguments. *See supra* note 3. Upon remand, the district court may address these claims in the first instance.

Supreme Court has adopted a forum analysis to balance "when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *United States v. Kokinda*, 497 U.S. 720, 726 (1990) (internal quotation marks and citation omitted). Thus, we must at the outset determine the nature of the forum established by the County when it opened the Antioch Library meeting room to various community groups.

We begin our forum analysis by "identify[ing] the nature of the forum" and "whether the forum [at issue] is public or non-public." *Cornelius*, 473 U.S. at 797. Forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and nonpublic fora. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir. 1999). Once the forum is identified, we determine whether restrictions on speech are justified by the requisite standard. *Cornelius*, 473 U.S. at 797.

**[2]** Traditional public fora such as public streets and parks are locations that "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). When the government intentionally dedicates its property to expressive conduct, it also creates a public forum. *Id.* Such designated public fora cannot be created by inaction; the government must "intentionally open[ ] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. The ability of the government to limit speech in a traditional or designated public forum is sharply circumscribed. Content-based regulation is justified only when "necessary to serve a compelling state interest and [when] it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. Content-neutral restrictions that regulate the time, place, and manner of speech are permissible so long as they are "narrowly tailored to serve a significant government interest, and [they] leave open ample alternative channels of communication." *Id.*

**[3]** Any public property that is not by tradition or designation a forum for public communication is classified as a nonpublic forum. *See DiLoreto*, 196 F.3d at 965. Regulation of speech in a nonpublic forum is subject to less demanding judicial scrutiny. "The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992).

**[4]** We have recognized that the Supreme Court, in decisions subsequent to *Perry* and *Cornelius*, has identified another category—the "limited public forum"—to describe a nonpublic forum that the government intentionally has opened to certain groups or for the discussion of certain topics. *See DiLoreto,* 196 F.3d at 965 (citing *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995)). Restrictions governing access to a limited public forum are permitted so long as they are viewpoint neutral and reasonable in light of the purpose served by the forum.[8]

---

[8]We have previously noted that "[t]he contours of the terms 'designated public forum' and 'limited public forum' have not always been clear." *DiLoreto*, 196 F.3d at 965 n.4. The terms are not interchangeable. A limited public forum is a sub-category of the designated public forum, where the government opens a nonpublic forum but reserves access to it for only certain groups or categories of speech. *Hopper v. City of Pasco*, 241 F.3d 1067, 1074-75 (9th Cir. 2001). In a limited public forum, we review restrictions on speech that are viewpoint neutral for their reasonableness. Other courts follow the same practice. *See, e.g.*, *Bowman v. White*, 444 F.3d 967, 975-76 (8th Cir. 2006) (eschewing the terminology of designated or limited public forum in favor of a designated public forum classified as either of a "limited" or "unlimited" character); *Warren v. Fairfax County*, 196 F.3d 186, 193-94 (4th Cir. 1999) (en banc); *Kreimer v. Bureau of Police of Morristown*, 958 F.2d 1242, 1261 & n.21 (3d Cir. 1992); *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991).

**B.**

We conclude that the Antioch Library meeting room is a limited public forum and that enforcement of the County's policy to exclude religious worship services from the meeting room is reasonable in light of the forum's purpose. It is clear, and neither party contends otherwise, that the forum created by the County is neither a traditional public forum nor a non-public forum. Rather, the parties dispute whether the Antioch meeting room constitutes a designated or limited public forum.

**[5]** In evaluating the type of forum at issue, we look to "the policy and practice of the government, the nature of the property and its compatibility with expressive activity, and whether the forum was designed and dedicated to expressive activity." *Children of the Rosary v. City of Phoenix*, 154 F.3d 927, 976 (9th Cir. 1998) (citing *Cornelius*, 473 U.S. at 802-03); *see also Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1098 (9th Cir. 2003). The purpose of our inquiry is to discern the government's intent in making the forum available for public use. *See Cornelius*, 473 U.S. at 802.

**[6]** The County's library meeting room policy allows "[n]on-profit and civic organizations, for-profit organizations, schools and governmental organizations" to use a branch Library meeting room for "meetings, programs, or activities of educational, cultural or community interest." Evidently, the County's purpose was to invite the community at large to participate in use of the meeting room for expressive activity. In practice, the County has allowed a variety of community groups to hold meetings in the Antioch Library meeting room, including the Sierra Club for purposes of letter writing, Narcotics Anonymous for a recovery meeting, and the East Con-

tra Costa Democratic Club to "let people learn about Democratic candidates and issues."**⁹**

A policy with a broad purpose however is not dispositive of an intent to create a public forum by designation. In *Good News Club*, the Supreme Court adopted the Second Circuit's conclusion that the State of New York had created a limited public forum when it made its public schools available for "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community." *Good News Club*, 533 U.S. at 102, 106 (internal quotation marks omitted). Other courts have interpreted similar broadly worded policies to create limited public fora. *See Bronx Household of Faith v. Bd. of Ed. of City of New York*, 331 F.3d 342, 346 (2d Cir. 2003) (recognizing that the same New York State policy at issue in *Good News Club* created a limited public forum); *Campbell v. St. Tammany Parish Sch. Bd.*, No. Civ. A. 98-2605, 2003 WL 21783317, at * 1 (E.D. La. July 30, 2003) (unpublished) (holding that school board's policy of granting access for "civic and recreational meetings . . . and other uses pertaining to the welfare of the community" created a limited public forum).**¹⁰**

[7] Here, the County's policy and practices make clear that the County did not intend for the Antioch Library meeting room to be open for indiscriminate use. The County's policy excludes schools from using the meeting room "for instructional purposes as a regular part of the curriculum" and orga-

---

**⁹**Faith Center offers examples of other applicants seeking access to other library meeting rooms in the County. As the district court correctly noted, however, the relevant forum is "defined by the access sought by the speaker," *DiLoreto*, 196 F.3d at 965, and in this case the forum is the Antioch Library meeting room.

**¹⁰**We have also interpreted policies with a "broad purpose" to nevertheless create a limited public forum. *See, e.g.*, *Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1051 (9th Cir. 2003) (holding that school policy to distribute flyers about summer activities that are "of interest to schoolchildren" established a limited public forum).

nizations who wish to engage in "religious services." Additionally, the policy requires a potential user to submit an application describing the intended use and identifying the applicant. Thereafter, the application must be reviewed and approved in advance by the County. Requiring prior permission for access to forum demonstrates that a public forum has not been created by designation. *See Cornelius*, 473 U.S. at 803. Finally, the policy requires an applicant to pay a fee for certain proposed uses. By charging a fee in certain circumstances, the County has demonstrated its desire to limit access to the library meeting room for certain purposes and speakers.

The record indicates that the County has consistently applied its policy restrictions. Faith Center does not contend that the County has ever failed to screen an application or that the County has granted access to an applicant on a non-policy basis. *See Hopper*, 241 F.3d at 1076 ("[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum.")

**[8]** The nature of the forum also supports the conclusion that, although the community at large has been invited to use the room, the library meeting room was not intended to be open for unlimited public expression. A library is quintessentially "a place dedicated to quiet, to knowledge, and to beauty," *Brown v. Louisiana*, 383 U.S. 131, 142 (1966); where "the worthy missions of facilitating learning and cultural enrichment" are fostered, *United States v. Am. Library Ass'n*, 539 U.S. 194, 203 (2003); and whose "very purpose is to aid in the acquisition of knowledge through reading, writing and quiet contemplation," *Kreimer*, 958 F.2d at 1261.

We also note that the Antioch meeting room is located within the Antioch Branch Library itself, that the meeting room is accessible during normal operating hours when other library patrons are present, and that sound can be heard by nonparticipants. Thus, while the Library meeting room is compatible with different kinds of expressive activity such as

a group discussion or lecture, we are mindful that the forum was not intended to undermine the library's primary function as a venue for reading, writing, and quiet contemplation.

[9] The County's policy delineating the speakers and uses appropriate for the Library meeting room, its consistent screening of applications, and its requirement of a fee in limited circumstances, underscores our conclusion that the Antioch forum was not dedicated for indiscriminate use. We therefore hold that the Antioch Library meeting room is a limited public forum whose restrictions to access may be "based on subject matter . . . so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. We proceed next to the question of whether the County's decision to prohibit Faith Center from conducting religious worship services in the Library meeting room is reasonable in light of the purpose served by the forum.

## C.

[10] "[R]easonableness analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated." *DiLoreto*, 196 F.3d at 967 (internal quotation marks omitted). Although the actual forum is a library meeting room, the nature and function of the County's public library as a whole is relevant in evaluating the reasonableness of the County's exclusions. *See id.* at 968.

[11] The purpose of the County's library policy is to make its library meeting rooms available as a community resource for different kinds of expressive activity such as meetings, discussions, lectures, and other "meetings, programs, or activities of educational, cultural or community interest." The County's policy regulates use of the meeting room to preserve the character of the forum as a common meeting space, an alternative to the community lecture hall, the corporate boardroom, or the local Starbucks. The library policy, for example,

prohibits schools from using the meeting room as a regular part of the school's curriculum. The County's exclusion of schools is reasonable in light of its purpose. To allow the meeting room to be converted into a classroom would transform the character of the forum from a community meeting room to a public school.

By the same token, the County's decision to exclude Faith Center's religious worship services from the meeting room is reasonable in light of the library policy so that the Antioch forum is not transformed into an occasional house of worship. Faith Center acknowledges that it seeks to reach out to those individuals who might not enter a traditional church building, and to bring the evangelical church experience to them. We see nothing wrong with the County excluding certain subject matter or activities that it deems inconsistent with the forum's purpose, so long as the County does not discriminate against a speaker's viewpoint. To conclude that the County's exclusion of religious worship services from its government buildings is unreasonable would result in the "remarkable proposition that any public [building] opened for civic meetings must be opened for use as a church, synagogue, or mosque." *Good News Club*, 533 U.S. at 139 (Souter, J., dissenting).

The County also has a reasonable interest in limiting the Library meeting room to uses that could potentially interfere with the primary function of the library. In *DiLoreto*, a school district policy excluded subject matter that was deemed too sensitive or controversial from advertisements on a high school's baseball fence. 196 F.3d at 966. "The District's concerns regarding disruption and potential controversy" were found reasonable in light of the circumstance of having a limited forum (the advertisement fence) within a public secondary school. *Id.* at 968. We thus upheld the exclusion of an advertisement containing the text of the Ten Commandments because it was inconsistent with the limited purpose served by the forum.

**[12]** Here too, the County has a legitimate interest in screening applications and excluding meeting room activities that may interfere with the library's primary function as a sanctuary for reading, writing, and quiet contemplation. The County reasonably could conclude that the controversy and distraction of religious worship within the Antioch Library meeting room may alienate patrons and undermine the library's purpose of making itself available to the whole community. *See id.* We therefore conclude that the County's prohibition on religious worship services is reasonable in light of the purpose served by the Library meeting room.[11]

## V.

Although the County's policy, and its decision to bar Faith Center from using the Library meeting room to conduct religious worship services, is reasonable in light of the forum's purpose, Faith Center is likely to succeed on the merits of its First Amendment claim if it can establish that the County discriminated against it because of its religious viewpoint.

In a limited public forum, the government is free to reserve access to the forum "for certain groups or for the discussion of certain topics." *Rosenberger*, 515 U.S. at 829. Access may not be restricted, however, if the "rationale for the restriction" is the "specific motivating ideology or the opinion or perspective of the speaker." *Id.* We must identify whether the County's exclusion of Faith Center's religious worship services from the Library meeting room is "content discrimination, which may be permissible if it preserves the purpose of that limited forum, [or] viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 829-30.

---

[11]The County, however, acknowledges that it may not bar Faith Center from using the Library meeting room to conduct activities that express a religious viewpoint on otherwise permissible subject matter.

We hold that the exclusion of Faith Center's religious worship services from the Antioch Library meeting room is a permissible limitation on the subject matter that may be discussed in the meeting room, and that it is not suppression of a prohibited perspective from an otherwise permissible topic. In so holding, we address two arguments raised by Faith Center that bear directly on our analysis. First, Faith Center contends that the prohibition on religious worship services is impermissible viewpoint discrimination because "prayer, praise and worship" is an educational, cultural, and community-related activity that has been suppressed due to Faith Center's religious perspective.

Second, Faith Center argues that its religious worship cannot be distinguished from other religious speech that is permitted in the Antioch Library, and to attempt a judicially enforceable distinction would entangle the government with religion in a manner forbidden by the Establishment Clause.

### A.

[13] We first address whether the County has discriminated on the basis of content or viewpoint. "Content discrimination occurs when the government chooses the subjects that may be discussed, while viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) (internal quotation marks omitted). The distinction between regulation on the basis of subject matter or viewpoint, however, "is not a precise one," *Rosenberger*, 515 U.S. at 831, and as this court has recognized, "the level at which 'subject matter' is defined can control whether discrimination is held to be on the basis of content or viewpoint," *Giebel*, 244 F.3d at 1188 n.10; *see also* Robert C. Post, *Subsidized Speech*, 106 YALE L.J. 151, 166 & n.96 (1996).

The Supreme Court's decision in *Boos v. Barry* exemplifies the difficulty of identifying whether a regulation excludes an

entire category of speech or restricts a prohibited viewpoint. 485 U.S. 312 (1988) (plurality opinion). In *Boos*, the Court reviewed a statute that prohibited the display of signs disparaging a foreign government from within 500 feet of that government's embassy. The plaintiffs argued that the statute discriminated on the basis of viewpoint because speech that favored the foreign government was permitted. From plaintiffs' standpoint, the subject matter regulated by the statute was 'speech concerning a foreign government' and the restriction improperly favored one side of the debate. The Court rejected this argument by defining the subject matter of the regulation at a different level of generality: speech against foreign governments. Because the statute excluded this entire category of speech without regard to any particular foreign government or criticism, a plurality of the Court concluded that the statute was viewpoint-neutral. *Id.* at 319.

**[14]** In *Lamb's Chapel*, the Court articulated a test for distinguishing between content and viewpoint discrimination. A religious group seeking to show a film series on child rearing from a Christian perspective was denied access to a school facility because of the school district's policy barring use of the rooms for religious purposes. The Court unanimously held that the school district "discriminate[d] on the basis of viewpoint [by] permit[ting] school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." 508 U.S. at 393. The test is whether the government has excluded perspectives on a subject matter otherwise permitted by the forum.

The Court applied that test in *Rosenberger*. In *Rosenberger*, the Court considered whether a University of Virginia policy of excluding religious publications from eligibility for student funds was viewpoint discrimination or a content-based exclusion. The University sought to avoid a possible Establishment Clause violation by excluding funding that supported "religious activity," including student publications that espoused

and promoted religious beliefs. *See* 515 U.S. at 825. The majority determined, however, that "the University [did] not exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. Because other student publications were free to discuss the topic of religion from a myriad of views other than the prohibited perspective, the University had discriminated on the basis of viewpoint. *Id.*

Most recently, in *Good News Club v. Milford Central School*, the Court held that a school district engaged in viewpoint discrimination when it refused to allow a Christian children's club ("Club") to offer a religious perspective on moral and character development in a school forum that was open to wide community involvement. The school district allowed its facilities to be used for activities "pertaining to the welfare of the community," and the facilities were available to any group that promoted the moral and character development of children. *See* 533 U.S. at 108. Comparing the circumstances to *Lamb's Chapel*, the Court found that the school district had discriminated on the basis of viewpoint by denying the Club the opportunity to teach moral and character development to children from a religious perspective. *See id.* at 111 ("What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons."). Once again, the focus was on whether some other group had been permitted to engage in the same kind of speech activity from a perspective other than the prohibited one.

*Good News Club* is notable for two other reasons. First, the Court concluded that even activities that are "quintessentially religious" can be used to further the purpose of moral instruction and character development. In *Good News Club*, the Club taught morality and character development by singing songs, relating stories from the Bible, reciting verses, memorizing

Scripture, and prayer. *See id.* at 103. For the Court's purposes however, "[t]he only apparent difference between the activity of Lamb's Chapel and the activities of the Good News Club is that the Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer, whereas Lamb's Chapel taught lessons through films." *Id.* at 110.

Second, the Court drew a distinction between the Club's activities and "mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n.4. Although the school district contended that the Club's activities constituted religious worship, the Court rejected that characterization and noted that the court of appeals made no such determination. The Court drew a line at religious worship because it did not regard worship in this case as merely a "viewpoint from which ideas are conveyed." *Id.* To the contrary, pure religious worship held a purpose unto itself, and it exceeded the boundaries of a forum limited to a discussion of the moral and character development of children. *See id.* at 138 n.3, 121 S.Ct. 2093 (Souter, J., dissenting).[12]

Turning to Faith Center's argument, we disagree that prohibiting religious worship services in the Antioch Library meeting room constitutes viewpoint discrimination. The test, as we have articulated, is whether the government has excluded a perspective on a subject matter otherwise permitted in the forum. To determine whether "religious worship" is a perspective on an allowable topic, we are guided by the Court's approach in *Good News Club* and draw reference from events and activities that have been hosted at the Antioch meeting room forum. *See id.* at 108.

---

[12]It should be noted that Justice Scalia's concurrence embraced the position that the majority was not willing to take. Justice Scalia argued that a distinction could not be made between the Club's activities and religious worship, and that in any event, the forum could not restrict religious worship from taking place there. *See id.* at 125-26.

**[15]** As noted above, the County acknowledged that Faith Center's morning activities on May 29, 2004 were permissible under the County's current policy. According to Faith Center's flyer describing the day's events, the morning "Wordshop" consisted of " 'The Making of an Intercessor,' an Endtime call to Prayer for every Believer, and how to pray fervent, effectual Prayers that God hears and answers." In other words, the morning workshop was devoted to the topic of communication and how to communicate effectively with one's God. Although Faith Center's activities may have included "quintessentially religious" speech such as a call to prayer, *Good News Club* makes clear that such speech in furtherance of communicating an idea from a religious point of view cannot be grounds for exclusion.

**[16]** It is clear that "communication" is a permissible topic of discussion in the Antioch Library meeting room. If the Antioch Speech and Debate club applied to use the meeting room to discuss the art of oratory and effective communication of secular subjects, the County would not likely reject such a proposal. It would therefore be viewpoint discrimination for the County to exclude Faith Center's perspective on the subject of communication because of the religious content of Faith Center's speech.

Other activities that occur at Faith Center's meetings are also permissible in the Antioch meeting room. Faith Center explains that meeting participants sometimes "engage in discussing the Bible and other religious books [as well as] teaching, praying, singing, sharing testimonies, sharing meals, and discussing social and political issues." These activities convey a religious perspective on subjects that are or have been permitted in the Antioch Library meeting room, such as a discussion of the Bible, discussions of social and political issues, and sharing life experiences.[13]

---

[13]Although the library meeting room policy refers to implementing rules and regulations, those rules and regulations were not a part of the district court record. We therefore refrain from commenting on the permissibility of singing, eating, and drinking in the Antioch Library meeting room.

The County, for example, permits meetings by the East Contra Costa Democratic Club to "let people learn about Democratic candidates and issues"—in essence to discuss social and political issues from the standpoint of the Democratic Party. A Narcotics Anonymous recovery meeting includes sharing personal life experiences similar to sharing testimonials of one's personal experiences with God and faith. A letter-writing campaign by the Sierra Club involves the discussion and communication of matters of social and political interest to its members. Discussions of the Bible and other religious and literary texts are also clearly permissible in the library. Thus, to exclude Faith Center from discussing topics that are appropriate to the forum because of a prohibited religious perspective would constitute viewpoint discrimination in violation of the First Amendment.

[17] Faith Center's afternoon activities on May 29th, however, did not consist of religious viewpoint activities. Faith Center occupied the Antioch forum expressly for "praise and worship" and in doing so Faith Center exceeded the boundaries of the library's limited forum. The district court understood, and Faith Center did not dispute, the contention that the afternoon activities constituted pure religious worship services. Rather, Faith Center argued before the district court that its religious worship could not be distinguished from the rest of its religious speech, and for the court to make such a distinction was constitutionally impermissible.

Pure religious worship, however, is not a secular activity that conveys a religious viewpoint on otherwise permissible subject matter. For every other topic of discussion that Faith Center engages in—the Bible, communication, social and political issues, life experiences—religious and non-religious perspectives exist. The same can be said for moral and character development in *Good News Club*, child rearing in *Lamb's Chapel*, and the topic of religion itself in *Rosenberger*.

**[18]** Religious worship, on the other hand, is not a viewpoint but a category of discussion within which many different religious perspectives abound. If the County had, for example, excluded from its forum religious worship services by Mennonites, then we would conclude that the County had engaged in unlawful viewpoint discrimination against the Mennonite religion. But a blanket exclusion of religious worship services from the forum is one based on the content of speech.

Faith Center contends that because a religious worship service is an "educational, cultural and community related" activity, excluding religious worship services from the forum when other community-related activities are permitted amounts to viewpoint discrimination. Although religious worship is an important institution in any community, we disagree that anything remotely community-related must therefore be granted access to the Antioch Library meeting room. That argument was rejected in *Good News Club* when the Court distinguished the Club's activities from "mere religious worship" and implicitly acknowledged that religious worship exceeded the boundaries of the limited public forum. *See Good News Club*, 533 U.S. at 112 n.4.[14]

Faith Center's reliance on the Second Circuit's decision in *Bronx Household of Faith* is misplaced. In *Bronx Household of Faith*, an evangelical Christian church sought access to a public school building for Sunday meetings that consisted of singing Christian hymns, prayer, Biblical preaching and

---

[14]It is difficult to imagine moreover that religious worship could ever truly be divorced from moral instruction or character development. That is not what the majority in *Good News Club* meant when it wrote: "we conclude that the Club's activities do not constitute mere religious worship, divorced from any teaching of moral values." *See id.* That statement must be taken in its proper context. The defendant district opened the forum in part for the moral and character development of children. As here, pure religious worship was too tenuously associated to the forum's purpose.

teaching, communion, and social fellowship. 331 F.3d at 347. The court concluded that, like *Good News Club*, the proposed meetings did not "constitute only religious worship, separate and apart from any teaching of moral values." *Id.* at 354. The court was guided by Justice Souter's description of the Club's activities in *Good News Club*.[15] Justice Souter characterized the Club's meetings as "an evangelical service of worship," combining teaching with "elements of worship." 533 U.S. at 138 n.3. The court found that the proposed meetings in *Bronx Household of Faith* were materially indistinguishable from Good News Club's activities and therefore *Good News Club* controlled the outcome of its case.

*Bronx Household of Faith* is inapposite because here we simply do not have "elements of worship" that further secular goals. Faith Center's afternoon activities on May 29, 2004, as described by Faith Center itself, consisted entirely of praise and religious worship. The Second Circuit made clear that its "ruling [was] confined to the district court's finding that the [church's] activities . . . [were] not simply religious worship, divorced from any teaching of moral values or other activities permitted in the forum." 331 F.3d at 354. *Bronx Household of Faith* is also distinguishable because of the nature of the forum. There, the church sought to rent empty school rooms for its Sunday meetings away from other public activity. The Antioch Library meeting room, on the other hand, is in the Antioch Branch Library and is available only during the Library's operating hours when other library patrons are present. The propriety of religious worship services varies by the different circumstances of each forum.[16]

---

[15]The court noted that the majority accepted Justice Souter's recitation of the Club's activities as accurate. *See Good News Club*, 533 U.S. at 112 n.4.

[16]Indeed, the unique factual circumstances of the County's limited forum set this case apart from the cases primarily relied upon by Faith Center to demonstrate the existence of viewpoint discrimination. *See, e.g.*, *Good News Club*, 533 U.S. at 103; *Lamb's Chapel*, 508 U.S. at 386; *Bronx*

**B.**

We turn to Faith Center's second argument, that the prohibition on religious services in the Antioch forum is viewpoint discrimination because religious worship cannot be distinguished from other permissible forms of religious speech. According to Faith Center, to enforce such a distinction, would entangle the government with religion in a manner forbidden by the Establishment Clause.

Faith Center relies on *Widmar v. Vincent* for support. In *Widmar*, a religious student organization sought access to state university facilities for religious worship and discussion. The University made its facilities available for activities by registered student groups but prohibited the use of University buildings "for purposes of religious worship or religious teaching." 454 U.S. at 265. The Court held that the University had created a public forum and therefore it could only "justify discriminatory exclusion from a public forum based on the religious content of the group's intended speech" by showing that its regulation was necessary to serve a compelling state interest and narrowly drawn to achieve that end. *Id.* at 269-70. The University regulation did not survive under the heightened judicial scrutiny.

In dicta that was not central to the Court's holding, Justice Powell discussed the difficulty he had with the dissent's contention that a distinction should be made between religious worship and other kinds of religious speech:

> First, the dissent fails to establish that the distinction has intelligible content. There is no indication

---

*Household of Faith*, 331 F.3d at 345; *Campbell*, 2003 WL 21783317 at * 1. In *Concerned Women for America v. Lafayette County*, 883 F.2d 32, 33 (5th Cir. 1989), the plaintiffs sought access to an *auditorium* rather than a meeting room at a public library. *Cf. Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975) (municipal auditorium was a public forum whose size and design made it conducive for expressive conduct).

when "singing hymns, reading scripture, and teaching biblical principles," cease to be "singing, teaching, and reading"—all apparently forms of "speech," despite their religious subject matter—and become unprotected worship.

Second, even if the distinction drew an arguably principled line, it is highly doubtful that it would lie within the judicial competence to administer. Merely to draw the distinction would require the university —and ultimately the courts—to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases.

*Id.* at 269 n.6 (internal citations omitted).

Faith Center echoes the same arguments. Faith Center asks how the County, or courts for that matter, can draw a line between permissible components of religious speech— singing, sharing testimonials, even prayer in the context of discussing how to communicate with God—and impermissible religious worship. Further, Faith Center argues that the government and courts are not competent to identify when certain expressive activity is religious worship. To enforce such a distinction would foster an excessive government entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

As Justice Scalia noted in *Good News Club*, however, "[w]e *have* drawn a different distinction—between religious speech generally and speech about religion—but only with regard to restrictions the State must place on its own speech, where pervasive state monitoring is unproblematic." 533 U.S. at 126 n.3. School officials routinely draw such distinctions in public schools where the subject of religion may be taught but

religious speech is barred from the government speaker. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (1994). The distinction to limit certain kinds of religious speech is also made for government employees in the workplace. *See Berry v. Dep't of Soc. Serv.*, 447 F.3d 642, 655 (9th Cir. 2006) ("Permitting appellants to evangelize while providing services to clients would jeopardize the state's ability to provide services in a religion-neutral matter." (internal citation omitted)).

We also have recognized that school officials may draw a distinction between different kinds of *private* religious speech in order to preserve the intended purpose of a limited public forum. In *Hills*, the court held that a school district's policy to distribute summer camp brochures to students could not exclude a brochure that advertised for a religious summer camp. *See* 329 F.3d at 1051. The court noted, however, that the school district "is not obligated to distribute material that, in the guise of announcing an event, contains direct exhortations to religious observance; this exceeds the purpose of the forum the District created." *Id.* at 1053. We have elsewhere endorsed the principle that the government can distinguish and exclude proselytizing religious speech to preserve the purpose for a limited forum. *See, e.g.*, *Prince v. Jacoby*, 303 F.3d 1074, 1086-87 (9th Cir. 2002) (finding that while student religious group must be given equal access to school's public address system to announce its activities, the group may be barred from doing so to "pray and proselytize"); *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 980 (9th Cir. 2003) (permitting discussion of religious beliefs in a high school graduation speech but prohibiting "proselytizing"); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1104 (9th Cir. 2000) (upholding school district's refusal to allow valedictorian to give a "sectarian, proselytizing speech" at graduation ceremonies).[17]

---

[17]The United States, as *amicus curiae* in support of Faith Center, argues that these school cases are distinguishable because they involve religious

This case differs from the aforementioned cases in that the County may not exclude proselytizing speech from the Antioch forum if that speech helps to convey a viewpoint about an otherwise appropriate topic. For example, Faith Center's morning "Wordshop" includes a call to prayer—speech that may be properly characterized as proselytizing. Nonetheless, because this proselytizing activity also furthers the discussion about communication and communicating with a higher authority, it cannot be grounds for exclusion.

The distinction to be drawn here is thus much more challenging—one between religious worship and virtually all other forms of religious speech—and one that the government and the courts are not competent to make. That distinction, however, was already made by Faith Center itself when it separated its afternoon religious worship service from its morning activities. Faith Center admits that it occupied the Antioch forum in the afternoon of May 29, 2004 expressly for "praise and worship." The County may not be able to identify whether Faith Center has engaged in pure religious worship, but Faith Center can and did.[18]

## VI

[19] We therefore conclude that prohibiting Faith Center's religious worship services from the Antioch meeting room is

speech broadcast to a captive audience. We agree that the government may be justified in excluding proselytizing speech from its limited fora. The point remains, however, that the government is capable of identifying proselytizing religious speech or speech that simply has aspects of religious worship.

[18]The dissent raises the specter of inevitable government entanglement when a County librarian encounters some future applicant who is less than candid about its religious worship activities. *See* Dissent Op. at 2792. We need not speculate about those possibilities. On the limited evidentiary record and in light of the procedural posture of this case, we decide only that which is before us.

a permissible exclusion of a category of speech that is meant to preserve the purpose behind the limited public forum. Religious worship services can be distinguished from other forms of religious speech by the adherents themselves. Because the district court erred in enjoining the County from applying its library meeting room policy to exclude Faith Center's religious worship services, we reverse the injunction in part.

[20] The County, however, acknowledged that its prohibition on religious worship services could not be applied to bar Faith Center from engaging in secular activities that express a religious viewpoint. Indeed, the County informed the district court that Faith Center's morning "wordshop" on May 29, 2004 was a permissible activity even though its purpose was to teach people how to pray or communicate with a divine presence. To that end, the County invited the district court to craft an injunction that ensured Faith Center's right to conduct activities in the meeting room that express a religious viewpoint, and allowed the County to exclude religious worship services. We note that the County offered several proposals for crafting a preliminary injunction that would achieve these balancing objectives and avoid the pitfalls of excessive government entanglement.[19] The district court, however, did not consider the County's suggestion regarding the scope of the injunction. We therefore vacate and remand so that the district court can craft an appropriate injunction after soliciting the views of the parties.

REVERSED in part, VACATED in part, and REMANDED for further proceedings.[20]

---

[19]At the preliminary injunction hearing, the County proposed that its meeting room application be altered to include a certification by the applicant that the meeting room will not be used for religious services. The County elaborated that a certification would allow it to rely on the honesty of the applicant while avoiding any potential issues of entanglement. We express no opinion on the merits of such a proposal.

[20]In light of our conclusions, we need not address whether the County has a necessary and compelling interest in excluding religious worship services from its library meeting rooms to avoid a violation of the Establishment Clause.

**Volume 2 of 2**

KARLTON, Senior District Judge, Concurring:

I concur in Judge Paez's well-reasoned opinion, which reflects the sorry state of the law. I write separately to express my dismay at that sorry state.

This should be a simple case it asks whether the county can be forced to subsidize a religious organization's prayer meetings by requiring it to provide the religious organization with a free place to worship. A quick reading of the First Amendment to the Constitution of the United States should answer the question. Judge Paez's opinion tracks the cases and reaches its laborious result because the law has so elaborated that the reaching of the conclusion requires the effort the opinion demonstrates. As I now explain, that elaboration is premised on a failure to accept the plain meaning of the First Amendment.

Both *Good News Club v. Milford Cen. Sch.*, 533 U.S. 98 (2001) and *Lambs Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), turn on the High Court's purported inability to distinguish between a sermon and a speech. That distinction, however, is compelled by the First Amendment, which establishes different standards relative to government action concerning speech and government action concerning religion. The purported inability of the High Court to adhere to the distinction embodied in the First Amendment leads it to conclude that the issues tendered by cases, such as the one at bar, implicate viewpoint discrimination under the free speech provisions of the First Amendment. They simply do not. As the First Amendment notes, religious speech is categorically different than secular speech and is subject to analysis under the Establishment and Free Exercise Clause without regard to the jurisprudence of free speech.

Those, like myself, who advocate adherence to the strictures of the Establishment Clause, do so not out of hostility towards religion. *See McCollum v. Board of Education*, 333 U.S. 203, 211-12 (1948); *Engel v. Vitale*, 370 U.S. 421, 433-34 (1962). Rather, we are motivated by recognition of the passions that deeply-held religious views engender, and the serious threat of marrying those passions to government power. *Engel*, 370 U.S. at 431-32 ("Another purpose of the Establishment Clause rested upon an awareness of the historical fact that governmentally established religions and religious persecutions go hand in hand.").

That threat is not merely historic. One need only look about the world to see that danger in play. The scenario is the same whether it is in Northern Ireland where Catholics and Protestants kill each other in an effort to establish governmental power, in Israel, where Jews and Muslims do the same, in Iraq, where Shi'a and Sunni are engaged in similar slaughter, or in Sudan where Muslims murder Christians. *See School District of Abington v. Schempp*, 374 U.S. 203, 219 (1963). Nor is that the only danger.

Where government plays a role in the religious life of a pluralist society, there is the danger that government will favor the majority religion and seek to control or prohibit the rites of minority religions. *See Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 126 S.Ct. 1211 (2006); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Employment Division v. Smith II*, 494 U.S. 872 (1990). Such favor can only lead to alienation and social unrest.

The wall of separation between church and state that Thomas Jefferson thought the First Amendment raised, in no way prejudices the practice of anyone's religion. *Everson v. Board of Ed.*, 330 U.S. 1, 15-16 (1947). Instead, it serves the salutary purpose of insulating civil society from the excesses of the zealous. *See id.* at 53-54 (J. Rutledge, dissenting). The *Good News Club* and *Lamb's Chapel* majorities' disdain of the Jefferson model is premised on the belief that religious values enhance rather than endanger society. The legal issue, however, is different. It asks whether one can distinguish between religious speech in a categorical way, and the answer is yes. Of course there may be close cases. Such cases require the development of a delicate jurisprudence designed to protect the Establishment Clause while insulating religious practice from government intrusion.

In any event it is simply beyond cavil that the instant case does not present a close question. Appellees have been completely candid in acknowledging that the purpose of the meetings they proposed to hold on public property is "Prayer, Praise and Worship Open to [the] Public, Purpose to Teach and Encourage Salvation thru Jesus Christ and Build Up Commun[ity]." To assert an inability to conclude that purpose is religious in every sense, is to engage in the kind of sophistry that gives the law a bad name. It may be that the majority of the Supreme Court really has doubt about the ability to distinguish between religious practice and secular speech. If so, they need only leave their chambers, go out in the street and

ask the first person they meet whether in the instant case the conduct is religious in character. It is simply untenable to insist that there is no difference between a prayer and e.g. political speech. To coin a phrase, one can only pray for the court's enlightenment.

While I believe that Thomas Jefferson has the better end of the debate, that belief is irrelevant. I concur in the opinion because, as a subordinate judge, it is my duty to adhere to the precedent of the Supreme Court "no matter how misguided." *Hutto v. Davis*, 454 U.S. 370, 374 (1982).

TALLMAN, Circuit Judge, dissenting:

The "Religious Use" exclusion is impermissible viewpoint discrimination because Contra Costa County (the "County") opened its public meeting room at the Antioch Library to the community in order "to encourage [its use] for educational, cultural and community related meetings, programs and activities."[1] Notwithstanding the broad and inclusive policy it

---

[1]The policy at issue has twice been amended while this litigation was pending, *Faith Center Church Evangelical Ministries v. Glover*, 2005 WL 1220947, at *1 (N.D. Cal. May 23, 2005), and, as modified by the Board of Supervisors of Contra Costa County, California, on December 14, 2004, now reads in relevant part:

*Contra Costa County Library*
*Policy for the Use of Meeting Rooms in Libraries*

It is the policy of the Contra Costa County Library to encourage the use of library meeting rooms for educational, cultural and community related meetings, programs, and activities.

* * *

*RELIGIOUS USE*
Library meeting rooms shall not be used for religious services.

RESOLUTION No. 2004/655 (Contra Costa County Bd. of Supervisors).

approved, the County has unlawfully excluded certain members of the community from engaging in activities that fall squarely within the policy's scope by examining the way an applicant's viewpoints are expressed. Political organizations like the local Democratic Party are admitted. Religious groups are not.

The County draws an arbitrary line in the sand, arguing that it has the right to decide what constitutes a religious service while failing to set forth specific guidelines defining the term. It contends that the Establishment Clause of the First Amendment requires County officials to exclude those who wish to engage in worship behind the closed doors of its library meeting rooms. My colleagues in the majority accept the County's skewed view of the First Amendment by upholding a policy which on its face and as applied produces the very entanglement the County ostensibly seeks to avoid, and in doing so the court creates a conflict with the Second Circuit and contradicts Supreme Court precedent. I respectfully dissent.

I

"[R]eligious worship and discussion . . . are forms of speech and association protected by the First Amendment." *Widmar v. Vincent*, 454 U.S. 263, 269 (1981). "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Id.* at 267-68. Both parties agree that religious activities, including worship, are speech protected by the First Amendment. However, the County adopts the views of Justice Stevens, dissenting in *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), when it argues that religious service or worship may be parsed from other religious speech—that religious worship is a category wholly separate from general religious speech. *See id.* at 130 (Stevens, J., dissenting). According to the County, allowing religious services in its library meeting rooms would "start[ ] the courts down a slippery slope whereby all public buildings

will be converted into houses of worship for the conduct of religious services." *Id.* at 139 (Souter, J., dissenting).

As support for its assertion, the County cites two Supreme Court cases, a Second Circuit case, and an Eastern District of Louisiana case, none of which address whether mere religious worship should or could be parsed from other types of religious speech. *See Good News Club*, 533 U.S. at 112 n.4 (concluding that a religious club's activities "[did] not constitute mere religious worship, divorced from any teaching of moral values," and therefore the parsing issue was not reached); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 388 n.2 (1993) (noting that the petitioner church did not challenge a school district's denial to use a high school for Sunday services, so the validity of that denial was not before the court); *Bronx Household of Faith v. Board of Educ. of the City of New York*, 331 F.3d 342, 355 (2d Cir. 2003) (declining to address whether religious worship is a distinct type of activity separate from other religious speech); and *Campbell v. St. Tammany Parish Sch. Bd.*, 2003 WL 21783317, at *9 (E.D. La. July 30, 2003) (declining to reach the issue of whether "mere religious worship" could be precluded from a particular forum).

Faith Center agrees that its meetings contain religious worship, and my colleagues find comfort in the fact that Faith Center explicitly listed worship activities on flyers for the meeting. But words on a flyer make no difference in the disposition of this case. The next religious group wishing to intermingle worship activities, admonished as to the consequences of such advertising, may not be so explicit about its meeting itinerary, or may simply call its worship activities religious "proselytizing," an acceptable form of speech under the policy according to the court. Maj. Op. at 2776. Regardless of what Faith Center chooses to print on its flyers, or what it chooses to call its activities, worship cannot logically be parsed from all other forms of religious expression in the way the County intends.

When compared to similar cases, such as *Bronx Household* and *Campbell*, where private religious groups conducted religious services in a government-owned forum, Faith Center's service cannot properly be described as "mere religious worship, divorced from any teaching of moral values." *See Bronx Household*, 331 F.3d at 346-48, 354 (affirming a preliminary injunction allowing a religious group equal access to public school classrooms after hours where the group's religious services could not be separated from a teaching of moral values); *Campbell*, 2003 WL 21783317, at *1-3, 9 (granting summary judgment to a religious group that wished to use a public school after hours, opened as a limited forum, for its quintessentially religious activities). Nor is it correct to say that Faith Center agreed its worship activities fall under the ambiguous, undefined category acknowledged by the Supreme Court as mere religious worship.[2]

---

[2]My colleagues point to one quote during the preliminary injunction hearing in which Faith Center seemingly agreed that its activities constitute "mere worship."

> The [c]ourt: What is your bottom line? Is your bottom line then the [c]ourt cannot issue any injunction which has the effect of precluding, as you would call it or the courts call it, mere worship in the library rooms?

> [Counsel for Faith Center]: That's right, your honor.

> This agreement does not bind Faith Center's activities to the Supreme Court's concept of "mere religious worship, divorced from any teaching of moral values" as noted in *Good News Club*, 533 U.S. at 112 n.4. Not even the district court understood Faith Center's agreement as comporting with *Good News Club*'s definition of "mere religious worship," as it correctly determined in its order granting the preliminary injunction that this case "presents a factual situation similar to the factual situations presented in the *Good News Club*, *Lamb's Chapel*, *Bronx Household of Faith*, and *Campbell* cases," which each held that the activities at issue were not religious worship devoid of discussion on otherwise permissible secular subjects. *Faith Center Church*, 2005 WL 1220947, at *7.

A

Although the Second Circuit in *Bronx Household* declined to answer the question whether religious worship may be parsed from other religious speech, the court was concerned as to how the judiciary or any government official could validly make the distinction. *See* 331 F.3d at 355 ("Would we be able to identify a form of religious worship that is divorced from the teaching of moral values?"). The court noted the dichotomy suggested by the Supreme Court in *Good News Club* between "mere" religious worship on the one hand and "worship that is not divorced from the teaching of moral values on the other." *Id.* "Further," the Second Circuit asked, "how would the state, without imposing its own views on religion, define which values are morally acceptable and which are not?" *Id.* This is the point of eschewing government decision-making based on the viewpoint at issue in the First Amendment Establishment Clause arena.

Here, the district court relied heavily, and properly so, on *Widmar* and *Bronx Household* for its conclusion that religious worship may not be parsed from other religious speech. *Faith Center Church*, 2005 WL 1220947, at *5. The County attempts to distinguish *Widmar* by arguing that the Supreme Court's comments about religious worship apply only to "open" forums, such as the forum in *Widmar*. However, the *Widmar* Court's analysis of "religious worship" was not based on the characteristics of the forum at issue, but the difficulty the government and the courts would have in drawing the line between religious worship and other religious speech:

> There is no indication when "singing hymns, reading scripture, and teaching biblical principles" . . . cease to be "singing, teaching, and reading"—all apparently forms of "speech," despite their religious subject matter—and become unprotected "worship."
>
> [E]ven if the distinction drew an arguably principled line, it is highly doubtful that it would lie within the

judicial competence to administer. Merely to draw the distinction would require [the government]—and ultimately the courts—to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the [government] with religion in a manner forbidden by our cases.

*Widmar*, 454 U.S. at 269 n.6(citations omitted).

The majority opinion here cites several cases where the Supreme Court has drawn a distinction between general religious speech and speech about religion. Maj. Op. at 2775-76. These cases involve speech before students at public schools and speech by government employees in the workplace. However, not only do the cited cases involve evangelical speech to a captive audience, but they are also instances where even proselytizing may be excluded. *No* amount of general religious speech is allowed in public schools or government workplaces during the business day if it is evangelical in design. Speech *about* religion is permissible in such limited fora where the purpose of the forum is very specific—school is for academic learning and the workplace is for work.

The Antioch Library opened its meeting room for a much broader purpose. My colleagues concede that evangelical speech is permissible under the "Religious Use" exclusion if it conveys a viewpoint on an otherwise permissible topic, and acknowledge that the distinction the County must draw here is more subtle than in any of the cases the opinion cites. Maj. Op. at 2775-76. But that is as far as the opinion goes in this analysis. It does not attempt to answer the insoluble riddle of how the County could parse religious speech which conveys a viewpoint on an otherwise permissible topic with *mere* religious worship that is impermissible speech according to the court. Instead, it claims that Faith Center has solved the riddle for us since Faith Center specifically calls its activities "wor-

ship." Under this reasoning, if Faith Center says what it is doing is worship, then the County need not make the distinction.

But this flawed analysis blithely ignores other similarly situated religious groups that may not make such a nice admission to the County in their applications to use the room. While the district court granted the preliminary injunction based on Faith Center's "as applied" challenge to the policy, Faith Center also brought a facial challenge to the policy. Ignoring the preliminary injunction's mandate that the County open its library meeting room to any "similarly situated individual or entity" may provide a neat literal shorthand allowing my colleagues to bypass the need for parsing religious worship from other religious speech in this specific instance. However, the majority's reasoning ignores the plain reality that some County official must make the call with no articulated standard to guide a determination of what constitutes "religious services" under the policy.

Announcing the strange rule that "[r]eligious worship services can be distinguished from other forms of religious speech by the adherents themselves," Maj. Op. at 2778, creates a system whereby the applicant itself decides what constitutes worship. Under the policy, the County will still have to determine what is and what is not religious worship in instances where a group does not identify in such detail its activity, and the County is not off the hook even if a group does say it will engage in religious worship. Creative wordplay cannot avoid the reality that worship is intangible, and even what Faith Center itself determines is religious worship may not be worship to another. *See Bronx Household*, 331 F.3d at 354-55 (finding "no principled basis upon which to distinguish [such] activities").

The County chooses to exclude Faith Center because it believes that allowing religious worship within its library meeting room violates the Establishment Clause. It contends

that patrons would then perceive the County to endorse a particular religion. Given the County's position, our court's newly created rule is nonsensical because the religious groups that the County claims will cause it to violate the Establishment Clause are the ones who would decide what speech constitutes a violation of the policy. I doubt the County had such a rule in mind when it created its "Religious Use" exclusion. The truth is that neither the County nor Faith Center can validly parse religious worship from religious speech under the County's broad and undefined policy.

B

Any attempt by the County to parse religious worship from other religious speech would trigger the inherent Establishment Clause entanglement problems it seeks to avoid. Justice Souter, in his dissenting opinion to *Good News Club*, described the religious activities in *Good News Club* as including elements of worship, such as prayer, a "challenge" that invited "saved" children to ask God for strength, and an "invitation" that asked "unsaved" children to receive Jesus Christ as their Savior from sin. 533 U.S. at 137-38 (Souter, J., dissenting). The majority in *Good News Club* agreed with Justice Souter's recitation of the elements of the religious activities at issue, but decided that these activities do not constitute mere religious worship. *Id.* at 112 n.4.[3]

Faith Center's religious service consists of prayer, praise, and a sermon, consistent with the type of worship in *Good News Club*. Faith Center's worship activities include discus-

---

[3]Although *Widmar* and *Good News Club* address this issue in dicta, it is essential to note that there is no such extensive Supreme Court dicta for the proposition that religious worship may be parsed from other religious speech in the context of a private group conducting meetings in places otherwise open to the public under a broad policy such as this one. The caselaw suggests the Court is clearly moving away from that notion and towards the principle that religious worship in this context cannot be distinguished from other religious speech.

sion of moral character and other secular subjects—well within the policy's scope, and not *mere* religious worship, which has yet to be adequately defined by any court. In order to divorce prohibited religious services from other permissible religious activities to be conducted in the meeting room, the County would need to define what constitutes mere religious worship, as well as how many secular topics are required to be discussed or contemplated before mere religious worship becomes something more. I wish the County the best of luck in that drafting endeavor.

Justice Scalia, in a concurring opinion to *Good News Club*, examined our ability to distinguish religious worship from other religious speech. He concluded that the distinction between worship and other religious speech has "no intelligible content" and no "relevance" to the constitutional issue. *Good News Club*, 533 U.S. at 126 (Scalia, J., concurring) (quoting *Widmar*, 454 U.S. at 269 n.6). Justice Scalia noted that the difficulty of distinction is proven by the inability of the Justices to agree on what category of religious speech was at issue in *Good News Club*. *Id.* at 126-27 (Scalia, J., concurring). He then added that "applying the distinction would require state monitoring of private, religious speech with a degree of pervasiveness that we have previously found unacceptable." *Id.* at 127 (Scalia, J., concurring).

There are as many ways to conduct "religious services" as there are religions in the world, not accounting for different sects of the same religion. The Supreme Court has said that the government "would risk greater entanglement by attempting to enforce its exclusion of religious worship." *Widmar*, 454 U.S. at 272 n.11 (quotation marks and citation omitted). The government "would need to determine which words and activities fall within religious worship" and "[t]his . . . could prove an impossible task in an age where many and various beliefs meet the constitutional definition of religion." *Id.* (quotation marks and citation omitted). The County cannot validly parse religious worship from other religious speech in

trying to apply this policy without engaging in the very action it is trying to prevent—entangling itself in religion in a manner that violates the First Amendment.

## C

Even if we were to ignore the inherent entanglement the exclusion would cause, the exclusionary portion of the policy is nonetheless facially invalid. While the County excludes religious services in its library meeting rooms, it does not define "religious services." How can a County librarian validly parse religious worship from allowable religious speech when the librarian does not have the proper guidelines by which he or she may recognize the offending conduct?[4]

The opinion never addresses what the County would do if another group were to conduct worship services without delineating its activities on a flyer. Are we then to accept that a librarian will know worship when he or she sees it? Are we now to declare that the County's librarians are experts in theology and world religion? Perhaps they might consult the books on the shelves of their libraries. Or are we only excluding traditional Christian worship because that is what is most familiar to the officials in Contra Costa County? Under the policy before us, the power to decide the definition of a religious service lies squarely in the lap of government officials, and that is the crux of the problem.

Separating religious worship from other religious speech inevitably leads to state entanglement in religion that would not otherwise exist should private religious groups be allowed

---

[4]The Board of Supervisors did not even try to define the term "religious services" in the policy it enacted by resolution. Instead, it provided, "[t]he County Librarian shall promulgate rules for the implementation of this policy." RESOLUTION NO. 2004/655. No such rules have ever been brought to our attention in this litigation and we must assume that their absence from the record is not an oversight by County counsel.

the freedom to conduct activities consistent with the goal of the policy, given reasonable time, place, and manner restrictions also imposed on all other groups wishing to use the public library meeting room. *See Widmar*, 454 U.S. at 278 (noting that the government's opening of its property to various forms of speech may "establish reasonable time, place, and manner regulations"). Religious worship is the expression of beliefs, convictions, viewpoints, and morality, and its means of practice are as diverse as the people who make up this nation. No government official has the ability to decide the constitution of religious worship. Any attempt would inevitably entangle the official in the Bill of Rights.

## II

The majority opinion not only ignores the obvious state entanglement problems the exclusion of worship presents, but it also holds that religious services cannot include speech which expresses viewpoints on otherwise secular subject matter, a conclusion contrary to the weight of Supreme Court authority. My court agrees with the County that the exclusion is content based and viewpoint neutral. Because my colleagues conclude the County has created a limited public forum,[5] the opinion holds that the content-based exclusion is permissible.

Based on its argument that religious worship may be parsed from other religious speech, the County contends that the policy excludes a whole category of speech with a distinct con-

---

[5]I do not agree that the County opened a limited public forum, thus allowing content-based discrimination. This case is similar to *Concerned Women for America, Inc. v. LaFayette County*, 883 F.2d 32 (5th Cir. 1989), in which the Fifth Circuit held that a library auditorium was a designated public forum when it was opened for organizations of a "civic, cultural or educational character," yet excluded religious or political groups. *Id.* at 33-34. However, because I believe that the "Religious Use" exclusion constitutes viewpoint discrimination, which is forbidden in all forums, I decline to address this issue further.

tent, apparently believing that all religious worship speaks of the same subject matter and contains no particular viewpoint on otherwise permissible secular topics. I disagree. The speech at issue here may include discussion of religious viewpoints on a variety of otherwise includible subjects, and to exclude this speech would be classic viewpoint discrimination. "Viewpoint discrimination is a form of content discrimination in which 'the government targets not subject matter, but particular views taken by speakers on a subject.' " *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 980 (9th Cir. 1998) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

> Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . , the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

*Lamb's Chapel*, 508 U.S. at 394 (quoting *Cornelius v. NCAA Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)) (alterations omitted).

The Supreme Court in *Good News Club* saw "no reason to treat the . . . use of religion as something other than a viewpoint merely because of any evangelical message it conveys." 533 U.S. at 112 n.4. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Id.* (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Common sense dictates that religious worship can include exploration of secular topics from a religious point of view, as Faith Center's meeting demonstrates. Enforcing the exclusion is therefore viewpoint discrimination

and Faith Center has made a clear showing of probable success on the merits of its claim.

A

The County argues that the exclusion "is directed to a distinct type of subject matter and separate category of speech, not a particular religious 'viewpoint' on an otherwise permissible subject." It represents its prohibition as "permissible content-based restrictions" which, for example, "exclude speech based on topic, such as politics or religion, regardless of the particular stand the speaker takes on the topic." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 969 (9th Cir. 1999). The County's argument is based on the erroneous belief that religious service may be parsed from other religious speech, and that "religious services" is a category of speech unto itself, and therefore qualifies as a whole topic of speech that is excludable under content-based discrimination.

First, as previously stated, the notion that religious worship may be parsed from other religious speech ignores the weight of Supreme Court authority against it. *See supra* § I. Second, even if the County were somehow able to parse religious worship from other religious speech, and all religious worship is treated alike under the exclusion, the County does not explain why religious services cannot include religious viewpoints on permissible subjects. *See Lamb's Chapel*, 508 U.S. at 393 (rejecting the Second Circuit's determination that a policy is viewpoint neutral because all religions and all uses for religious purposes are treated alike).

Faith Center's religious service consists of singing songs, engaging in prayer, and sermons about community and moral character from a Biblical viewpoint. Community and moral character are two secular subjects that would be includable under the policy's broad scope. Yet the County and my colleagues assert that Faith Center's worship cannot express a

viewpoint because of the *way* ideas are communicated—through prayer and sermon.

As an example of what it deems to be the distinction between subject matter and viewpoint discrimination, the County argues that "true viewpoint discrimination . . . would occur if the County permitted Christian or Buddhist religious services but disallowed Muslim or Jewish services." However, the County must therefore assume all religious services, regardless of denomination, do not communicate ideas on topics that are permissible under the policy, such as moral character. The "exclusion of several views . . . is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831.

### B

The religious service portion of Faith Center's meeting is not unlike the services at issue in *Bronx Household* and *Campbell*, which were not mere religious worship. The Eastern District of Louisiana in *Campbell* noted that "[i]t is difficult to imagine any religious service, no matter how traditional or nontraditional that does not include sermons, homilies or lessons directed at moral and ethical conduct or how one should live one's life." 2003 WL 21783317, at *9. The Second Circuit in *Bronx Household* concluded that even the "quintessentially religious" services at issue were not "only religious worship, separate and apart from any teaching of moral values." 331 F.3d at 354 (citing *Good News Club*, 533 U.S. at 112 n.4). Both cases were decided within the framework of *Good News Club*, where the Supreme Court disagreed with the suggestion that something quintessentially religious or decidedly religious in nature "cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint." 533 U.S. at 111.

Although my colleagues take pains to distinguish it, *Bronx Household* parallels this case in many ways and is instructive

on the interpretation of the precedent set by *Good News Club*. The Bronx Household of Faith applied to rent space in a public school in New York for Sunday morning meetings that included, at least in part, activities that can fairly be described as religious worship. *Bronx Household*, 331 F.3d at 345. The New York City Board of Education issued a policy similar to the one in this case, allowing community groups to meet in school classrooms after hours for "social, civic and recreational meetings and entertainment, and other uses pertaining to the welfare of the community." *Id.* at 348. The church group characterized its meeting as a "service consist[ing] of the singing of Christian hymns and songs, prayer, fellowship with other church members and Biblical preaching and teaching, communion, sharing of testimonies and social fellowship among the church members." *Id.* at 347. Bronx Household filed a motion for a preliminary injunction to enjoin the Board of Education from enforcing its policy prohibiting "religious services or religious instruction" at the school after hours. *Id.* at 346. The district court granted the preliminary injunction and the Second Circuit affirmed. *Id.* at 348, 357.

The Second Circuit concluded that, after *Good News Club*, the district court did not abuse its discretion in determining that Bronx Household was substantially likely to establish that the Board of Education violated its First Amendment free speech rights. *Id.* at 354. While the majority in *Good News Club* characterized the Good News Club's activities as "the teaching of morals and character development from a particular viewpoint," 533 U.S. at 111, the *Bronx Household* court determined that this characterization "cannot be divorced from Justice Souter's detailed description [in his dissent] of the Club's activities [as worship] that the majority adopted as accurate." *Bronx Household*, 331 F.3d at 354 (citing *Good News Club*, 553 U.S. at 112 n.4). The Second Circuit could not find any meaningful distinction between the activities Bronx Household was engaging in, and the activities at issue in *Good News Club*, where the Supreme Court held that excluding a club's religious activities from school classrooms

otherwise open to community groups was discrimination based on viewpoint. *Id.*

Faith Center's religious activities and those in *Bronx Household* and *Good News Club*, are likewise too similar to make any meaningful distinction that would immunize the County from First Amendment violations. Whether "mere religious worship" can be defined or not, the County's assertion that the prohibition of "religious services" is nothing more than content-based discrimination runs counter to the precedent set in *Good News Club.*

The majority opinion attempts to distinguish *Bronx Household* in two ways: (1) Faith Center's activities do not contain "elements of worship" that further secular activities as in *Bronx Household*, but consist entirely of praise and religious worship; and (2) the forum in *Bronx Household* was different because the meeting was held in a school classroom after hours rather than a library meeting room during the day. Maj. Op. at 2772-73. But this reasoning is based on a faulty premise and an irrelevant issue.

1

Faith Center has never claimed that its services are *mere* religious worship, devoid of speech on permissible secular topics.[6] Faith Center specifically argues that its activities are similar to those in *Bronx Household*, in which the Sunday morning meeting services contained the "singing of Christian hymns and songs, prayer . . . Biblical preaching and teaching, communion, sharing of testimonies and social fellowship among the church members." 351 F.3d at 347. The only differences between the church's activities in *Bronx Household* and those of Faith Center is that the *Bronx Household* church did not call its activities "worship" and failed to conveniently

---

[6]*See supra* § I n.2.

separate on a flyer the "worship" portion of its activities with a fellowship meal discussing secular topics. *Id.* at 347, 354.

Apparently, this is enough for my colleagues to declare that these cases are so dissimilar that to reverse the district court here would not be creating a circuit split. They are wrong. Framing the argument in this manner repeats the same analytical mistake committed by the University of Missouri in *Widmar*:

> The question is not whether the creation of a religious forum would violate the Establishment Clause. The University has opened its facilities for use by student groups, and the question is whether it can now exclude groups because of the content of their speech.

454 U.S. at 273.

The common issue in all of these cases is what types of activities encompass a religious worship service. Faith Center explains that during its service Pastor Hattie Mae Hopkins may deliver a sermon, and the group may pray and sing religious songs. Not only are these activities the same as those at issue in *Bronx Household*, thus lending credence to the notion that the two cases are in fact indistinguishable, but parsing out the actual nature of the worship clarifies the answer to a question my colleagues never bother to ask: *why* is religious worship not speech containing viewpoints on otherwise permissible secular topics?

Singing a religious song may very well be akin to singing about morality according to religious tenets. Praying is usually speech containing praise to a higher being, but may also contain personal characterizations of one's own life, wishes, hopes, or concerns. Pastor Hopkins's sermon is the clearest example of religious speech which expresses a viewpoint on otherwise permissible secular topics. One can imagine the

variety of subject matter that could be included in a sermon—money, family, love, or avoiding drugs and alcohol, to name a few. The list is endless.

Instead, the opinion categorizes all of Faith Center's worship activities into one neat box and then calls it impermissible speech. Yet it never examines the nature of that speech.

2

The opinion also distinguishes *Bronx Household* by where the meeting rooms are located. Comparing this case to *Bronx Household* brings forth the inevitable question as to whether there is a difference between non-disruptive meetings held in a public meeting room during library hours and meetings held in an empty classroom or auditorium on public school grounds after school or on weekends. Despite any facial distinctions, Faith Center's religious services do not lose their character as communication on permitted subject matter from a religious viewpoint simply because they are held in a library meeting room open to public use rather than at a school after hours. It is important to emphasize that the County has never argued that noise from Faith Center's religious activities disturbed the peace of other library patrons elsewhere in the building. Unlike the cases in which groups were allowed on a public school campus to hold meetings, the policy did not restrict the use of the library meeting room to after hours when the stacks and reading area were closed.

The County argues that because the library is open to the public during the hours in which Faith Center wishes to hold its meetings, library patrons would come to believe that the County is endorsing Faith Center's religious service. Looking at the context of Faith Center's meetings, a reasonable observer, "aware of the history and context of the community and forum," would no more believe that the County was endorsing Faith Center's meeting than it would believe the County was endorsing the Boy Scouts, the Sierra Club, or

Narcotics Anonymous. *See Good News Club*, 553 U.S. at 119 (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779-90 (1995) (O'Conner, J., concurring)). Our court says that "[t]he County reasonably could conclude that the controversy and distraction of religious worship within the Antioch Library meeting room may alienate patrons and undermine the library's purpose of making itself available to the whole community." Maj. Op. at 2765. Yet the library opened itself up to another group which could easily be as controversial and distracting to some patrons—the East Contra Costa Democratic Club. Clearly, the opinion sees no problem with other types of controversial speech.

All meetings held at the Antioch Library are closed-door meetings. There is no evidence that Faith Center's religious service was generally disruptive or that library patrons were bothered. The reasonable observer would be the library patron who knows the purpose for the meeting room, its policy, and its scope. This patron would be aware of the number of different community groups that have used the meeting room. Arguing that this informed observer would perceive a government endorsement of Faith Center's activities just because of the possibility that he or she may hear some of what is going on in the room is akin to saying that this individual would perceive the County to be endorsing specific political speech when the East Contra Costa Democratic Club used the same room. There is simply "no realistic danger that the community would think that the [Library] was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental." *Lamb's Chapel*, 508 U.S. at 395; *see Widmar*, 454 U.S. at 271 (holding that allowing equal access to religious groups would not be incompatible with a government's compelling interest in avoiding an Establishment Clause problem).

The County further argues that cases like *Bronx Household* found no Establishment Clause violation *because* the meet-

ings were held after school hours.[7] This interpretation of the case is not supported by a reading of *Bronx Household*, as the hours were but one factor in the Second Circuit's ultimate ruling on whether the school's policy presented Establishment Clause problems. 331 F.3d at 356. In addition to the hours, the proposed meetings: (1) were "not endorsed by the School District"; (2) were "not attended by any school employee"; and (3) were "open to all members of the public." *Id.*

While community meetings are held during library hours, Faith Center's meeting would also be open to the public. In addition, (1) the County would not be endorsing the meeting (in fact, the flyer for Faith Center's meeting specified that it would be the meeting's sponsor); (2) all library patrons would be on the premises voluntarily (unlike children attending public school during school hours); (3) the meeting would be held in a closed room; and (4) patrons would be aware of the policy and the types of groups that have used the meeting room. Additionally, the County would be able to enforce reasonable time, place, and manner restrictions, applicable to all groups using the meeting room, in order to maintain the academic atmosphere of the remaining library space. *See Widmar*, 454 U.S. at 276. Faith Center only intended to use the Antioch Library meeting room one Saturday every other month for four hours. Certainly the County could place a reasonable restriction on the number of times any group may use the meeting room within a one or two month span, thus alleviating the County's fear that the library meeting room will become a permanent house of worship.

The Supreme Court's decisions in *Good News Club*, *Widmar*, and *Lamb's Chapel*, and the Second Circuit's opinion in *Bronx Household* cannot meaningfully be distinguished from

---

[7]I note that the court's opinion does not address the County's Establishment Clause argument, but distinguishing *Bronx Household* from this case on the basis of the forum in each inevitably forces us to confront this issue.

the facts presented in this case. Faith Center has demonstrated that the County's enforcement of the policy is substantially likely to result in restricting speech based on viewpoint.

### III

I do not question Contra Costa County's sincere appreciation of one of our nation's fundamental constitutional tenets—the separation of Church and State—or my colleagues' adherence to this important principle. But the County has gone too far, and the court ignores the inherent constitutional flaws in the County's argument. In the County's attempt to walk the line between opening its doors to encourage its patrons to speak freely and closing its ears to religious doctrine, it has prevented its citizens from voluntarily hearing the "educational, cultural and community" views of an entire segment of the population in an accessible public space it opened for that very purpose.

Rather than adopting a policy of neutrality and placing reasonable time, place, and manner restrictions on every group that uses the library meeting rooms, the County has gone to great lengths to exclude a non-disruptive community group based on the views it wishes to express. The court fails in its analysis to adequately acknowledge the Establishment Clause entanglement problems this exclusion creates. Just as the government's endorsement of one particular religion would run counter to the principles upon which this nation was founded, a County librarian's attempt to define what constitutes religious worship and what does not also violates these principles. Squelching a viewpoint based solely on the non-obtrusive manner in which it is spoken impermissibly silences speech and exhibits a prejudice against religion that the First Amendment does not tolerate.

I see no abuse of discretion in the district court's grant of a preliminary injunction requiring the County to allow Faith Center the same access to the Antioch Library's meeting

room that most other groups are allowed under the County's broad, inclusive policy. I respectfully dissent.